

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SLT:GMP  
F. #2013R01789/OCDETF #NY-NYE-745

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 13, 2015

By Hand and ECF

The Honorable Roanne L. Mann  
United States Magistrate Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York

    Re: United States v. Iman Kobeissi,  
       Magistrate Docket No. 15-962

Dear Judge Mann:

    The government respectfully submits this letter with regard to the bail hearing of the above-captioned defendant, scheduled for Tuesday, October 13, 2015.  IMAN KOBEISSI is charged in a complaint with two offenses: (1) money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h); and (2) unlicensed dealing in firearms conspiracy, in violation of Title 18, United States Code, Sections 371, 922(a)(1)(A) and 922(a)(4).  The government moves for a permanent order of detention on the grounds that KOBEISSI presents a serious risk of flight and a danger to the community.

    As detailed below, because of the significant jail time that KOBEISSI is facing, her lack of ties to – and lack of immigration status in – the United States, her extensive international ties with numerous criminal associates, and her close ties to individuals with access to significant financial assets, KOBEISSI poses a risk of flight that cannot be mitigated by any condition or combination of conditions.  Moreover, in light of the crimes charged and KOBEISSI's ties to designated terrorist organization Hezbollah, she presents a danger to the community.

I. Factual Background

    The government proffers the following facts in support of its motion for a permanent order of detention.

A. <u>The Money Laundering Conspiracy</u>

In or about late September 2013, KOBEISSI approached a confidential source with the DEA ("CS1") at a meeting in Beirut, Lebanon. During the course of the meeting, KOBEISSI offered CS1 – who posed as an individual who worked with drug traffickers – her services in laundering narcotics proceeds through her contacts in Lebanon. Specifically, KOBEISSI stated that she had criminal associates in Lebanon who could arrange to launder drug proceeds and who would be interested in purchasing narcotics. KOBEISSI was later introduced to a DEA undercover agent (the "UC") and an individual posing as his/her associate who represented themselves as drug traffickers and money launderers.

KOBEISSI introduced the UC to one of her money laundering co-conspirators ("CC1") located in the United Kingdom. On or about September 24, 2014, an undercover agent gave 30,000 British Pounds (the equivalent of $50,000 U.S. dollars) to CC1, which were represented to be narcotics proceeds. After receiving the cash, CC1 arranged to have the funds transferred to an account that had been provided by the UC, namely an undercover account located in Brooklyn, New York, on or about October 3, 2014.

On or about October 19, 2014, KOBEISSI met with the UC and another confidential source in Brooklyn, New York. During that meeting, KOBEISSI discussed her contacts in France who were capable of laundering money through Blom Bank, and offered to introduce the UC to them. During a meeting the following day, on October 20, 2014, KOBEISSI specifically discussed an attorney who had connections with high-level banking officials in France and Lebanon. This individual was later identified as KOBEISSI's co-conspirator, Joseph Asmar.

On November 18, 2014, the UC placed a Skype call to KOBEISSI. During this call, KOBEISSI was present with Joseph Asmar; the UC discussed with Asmar the possibility of meeting him in person in Sofia, Bulgaria. A face-to-face meeting took place between Joseph Asmar and a DEA confidential source, on March 5, 2015 in Paris, France. This meeting was surveilled and photographed by the French Police. The purpose of the meeting was to finalize the delivery of approximately $250,000, in euros, that were purported to be narcotics proceeds. During that meeting, the confidential source informed KOBEISSI and Asmar that his/her associates would be importing a shipment of narcotics into Belgium and, therefore, would have additional narcotics proceeds for KOBEISSI and Asmar to launder. KOBEISSI and Asmar indicated that they would be able to assist the confidential source's drug trafficking associate. On March 6, 2015, the UC gave KOBEISSI

approximately 214,460 euros (equivalent to $250,000 United States dollars) in cash, in a bag. On March 19, 2015, the funds were received in a DEA undercover shelf account, less a 20 percent commission that had been agreed upon between the UC, KOBEISSI and Asmar. During subsequent meetings between the UC and Asmar in June 2015, Asmar stated that he could launder up to $8 million.[1]

Subsequent to the June 2015 meetings, the UC and Joseph Asmar maintained communications, and agreed to conduct a bulk money transaction of narcotics proceeds in Belgium. Asmar agreed to a 12 percent commission fee for arranging the transaction. On September 4, 2015, the UC handed $150,000 worth of euros to two of Joseph Asmar's associates. After dropping the money off to Asmar's associates, the UC notified Asmar via text message that the UC had delivered the Euros, and that all had gone well with the transaction.

### B. The Unlicensed Firearms Dealing Conspiracy

In October 2014, KOBEISSI also began discussing the possibility of obtaining weapons and ammunition from the UC for her associates in Hezbollah. To that end, KOBEISSI requested to introduce the UC to her Hezbollah contacts to finalize the details of the illicit transactions.

During the October 19 and October 20, 2014 meetings discussed above, KOBEISSI explained to the UC in further detail her weapons export scheme. KOBEISSI stated that she wanted to introduce the UC to her contacts in the Iranian government who were seeking to obtain weapons and other types of equipment that were difficult to procure (i.e., restricted technology, weapons, weapons parts and military/civilian aircraft parts). KOBEISSI advised that her contacts would like to obtain such weapons and equipment from the UC. KOBEISSI stated that her contacts wanted "everything." In an e-mail exchange with the UC, KOBEISSI informed the UC that she had customers in Iran who would like to purchase a variety of firearms and blue prints for "heavy weaponry." In one list KOBEISSI provided to the UC containing a request for firearms for her Iran-based customer, KOBEISSI included an order for more than 1,000 military-style assault rifles, including M200 sniper rifles, M4 carbine rifles and Objective Individual Combat Weapons, as well as 1,000 Glock

---

[1] Asmar is charged with money laundering conspiracy and money laundering in United States v. Joseph Asmar, 15 CR 491 (ENV). Notably, Asmar also touted his connections with Hezbollah and, during a meeting with the UC in June 2015, discussed the possibility of Hezbollah providing security to narcotics shipments at transshipment points in Africa and the Middle East.

3

handguns. In another communication, KOBEISSI attempted to obtain thousands of handguns for her Hezbollah associates.

### C. Other Uncharged Offenses

During recorded conversations between KOBEISSI and the UC, KOBEISSI explained that she could arrange for planes from South America laden with multi-ton shipments of cocaine to land safely in Africa as a transit point before the drugs were smuggled to the United States or Europe. During those conversations, KOBEISSI also discussed the potential for obtaining aircraft parts for her customers in Iran in violation of U.S. sanctions. In the recordings of that conversation, KOBEISSI can be heard stating that they had to hurry and obtain the aircraft parts while there were still sanctions against Iran so they could earn additional money for smuggling in the sanctioned parts. KOBEISSI was arrested on October 8, 2015, following a meeting in Atlanta with a criminal associate discussing the smuggling of blood diamonds out of Africa as a method to launder millions of dollars in drug proceeds.

## II. Argument

### A. The Bail Reform Act

Under the Bail Reform Act, Title 18, United States Code, Sections 3141, et seq., federal courts must order a defendant's pre-trial detention upon determining that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991); United States v. Chimurenga, 760 F.2d 400, 408 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;

4

      (3) the history and characteristics of the person, including—

          (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse and criminal history;
          (B) whether, at the time of the current offense, the person was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State, or local law; and

      (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Title 18, United States Code, Section 3142(g).

    B.  <u>Factors Supporting Detention</u>

      For the following reasons, the government respectfully submits that a preponderance of the evidence shows that the defendant presents a serious risk of flight; and, moreover, she presents a danger to the community.

      1.  <u>Nature and Circumstances of the Crimes Charged</u>

      As detailed in the Complaint, KOBEISSI was involved in several different conspiracies involving not only the laundering of narcotics proceeds, but a conspiracy to engage in the unlicensed dealing of firearms with customers in Lebanon and Iran. In several of the discussions in which KOBEISSI described her plan to traffic firearms, she specifically discussed providing those weapons to individuals in Hezbollah, the Lebanese political party that has been designated a terrorist organization by the United States. In addition to the charged conspiracies, KOBEISSI also engaged in discussions with an undercover DEA agent regarding trafficking cocaine and obtaining airplane parts that were forbidden from being exported to Iran for customers in Iran. Moreover, she was arrested following a meeting with a criminal associate in Atlanta to orchestrate the smuggling of "blood diamonds" out of Africa.

      The offenses charged in the complaint carry heavy penalties. For example, the charged money laundering conspiracy carries a statutory maximum of twenty years, and an

5

estimated advisory Guidelines range of 151 to 188 months' incarceration. The charge of unlicensed firearms dealing conspiracy in this case, in light of the fact that KOBEISSI tried to procure several different types of machine guns and the number of firearms she tried to obtain, carries an estimated advisory Guidelines range of 97 to 121 months' incarceration.

2. History and Characteristics of the Defendant

In addition to the serious charges that KOBEISSI faces in the instant prosecution, her prior history and characteristics establish her inherent risk of flight that cannot be mitigated by any condition or combination of conditions.

KOBEISSI was born in Lebanon, is a Lebanese and French citizen and has no immigration status in the United States, other than a tourist visa. KOBEISSI has extensive international ties with numerous criminal associates, and has regular international travel. On the recordings of her meetings with the DEA undercover agent, KOBEISSI can be heard discussing her criminal associates and connections with individuals in Lebanon, various countries in Africa and throughout Europe. Specifically, KOBEISSI discussed her connections with individuals in a variety of countries who had the ability to launder illicit proceeds, several of whom she stated had connections to banking officials. KOBEISSI has also discussed with the undercover agent her connections with Hezbollah. Indeed, by her own recorded statements, KOBEISSI has acknowledged close associations with criminal groups and associates in Lebanon, Iran, Benin, Ghana, Nigeria, the Democratic Republic of the Congo, Bulgaria, Cyprus, Belgium, Hungary, France and the United States. Notably, many of these countries, including her native country of Lebanon, do not have extradition treaties with the United States.

In sum, the defendant has the means, motive and opportunity to flee the country and should be detained without bail. See United States v. Stanford, 341 F. Appx. 979, 983 (5th Cir. 2009) (holding that the defendant's financial resources, international network and frequent foreign travel supported the district court's determination that the defendant was a flight risk and should be detained); United States v. Botero, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) (finding pretrial detention warranted where the defendant had "considerable means and foreign connections which would make it possible for him to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences"); see also United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir. 1990) (The government established by a preponderance of the evidence that no condition or set of conditions will reasonably assure defendant's presence at trial because his ties to the community did not outweigh the presumption plus the evidence of his financial assets outside the country and his family tie to Honduras, particularly in light of the potential maximum sentence of life plus sixty years that he faced under the indictment).

3. Weight of the Evidence of Guilt

Where the evidence of guilty is strong, it provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam)(where "the evidence against defendants is strong, the incentive for relocation is increased").

The evidence against the defendant here is overwhelming. As noted in the Complaint, most of the conversations during which the defendant discussed her money laundering capabilities, her plans to traffic weapons without a license, her future plans to traffic narcotics and her plans to traffic airplane parts to Iran, against which the United States has specific sanctions banning the export of airplane parts, were caught on audio, and sometimes video, recordings by an undercover DEA agent. The conversations that took place between the undercover DEA agent and the defendant over WhatsApp and e-mail, such as the defendant's list of firearms, including machine guns, were also maintained and place into evidence. The meetings that took place between the defendant and the confidential source and the undercover DEA agent in Paris, France, were surveilled and photographed by the French police. Given the strength of the evidence against the defendant and the large penalty she faces upon conviction, the defendant KOBEISSI has a powerful incentive to flee.

4. Danger to the Community

The danger to the community posed by the defendant's release is amply demonstrated by her involvement in international arms trafficking – specifically, her attempts to obtain thousands of handguns, assault rifles, machine guns, sniper rifles and military-grade heavy weapons for multiple criminal groups. Many of these weapons were being procured for the defendant's associates in Hezbollah, a designated terrorist organization. Other weapons, the defendant intended to smuggle into Iran, for use by criminal groups there. While the DEA undercover agents KOBEISSI was negotiating with obviously did not provide her with actual weapons, KOBEISSI's words and actions strongly suggest that she has previously engaged in similar arms deals. As detailed in the Complaint, KOBEISSI provided the agents with detailed lists of weapons, weapon systems and ammunition that she wished to purchase, discussed pricing details and provided a roadmap for how the weapons could be smuggled into the Middle East. She was also seeking to purchase thousands of weapons, including military-grade equipment such as sniper rifles, automatic weapons and rocket-propelled grenades. All of these are hallmarks of a person who is a professional arms trafficker, not a first-time neophyte.

III.    Conclusion

For all of the foregoing reasons, the government respectfully requests that a permanent order of detention be entered with respect to the defendant IMAN KOBEISSI.

In the event that the Court is inclined to release the defendant over the government's objection, the government respectfully requests that any such release order be stayed pursuant to 18 U.S.C. § 3142(f) pending the government's request for a detention hearing before the assigned District Judge

                              Respectfully submitted,

                              KELLY T. CURRIE
                              Acting United States Attorney

By:        /s/
                              Steven L. Tiscione
                              Gina M. Parlovecchio
                              Assistant U.S. Attorneys
                              (718) 254-6228/6317